UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JESSE COOPER, as CO-TRUSTEE OF THE SYLVIA RUBIN LIFETIME TRUST f/b/o DEBORAH COOPER, | * * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 24-cv-12189-ADB |
| ANDREW SHABSHELOWITZ, JEFFREY J. UPTON, and WESTON ASSOCIATES, INC., | * * * * | |
| Defendants. | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff Jesse Cooper ("Plaintiff" or "Cooper"), as co-trustee of the Sylvia Rubin

Lifetime Trust f/b/o/ Deborah Cooper ("the Trust"), initiated this action alleging breach of

fiduciary duty against all Defendants, legal malpractice and negligence against Andrew

Shabshelowitz ("Shabshelowitz") and Jeffrey Upton ("Upton"), violation of Massachusetts

General Laws 93A and fraud against Weston Associates, Inc. ("Weston Associates" or

"Weston") and Upton, breach of contract against Weston Associates, and aiding and abetting

breach of fiduciary duty against Upton.  For the reasons set forth below, Defendants' motion is

**GRANTED** in part and **DENIED** in part.

# I.    BACKGROUND

"In considering a motion to dismiss, the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in plaintiff's favor." <u>Doe ex rel. Doe v. Cavanaugh</u>, 437 F. Supp. 3d 111, 115–16 (D. Mass. 2020).

## A.    Relevant Facts

Plaintiff Jesse Cooper is a co-trustee of the Sylvia Rubin Lifetime Trust, the successor in interest to Sylvia Rubin. [ECF No. 1 ("Compl.") ¶ 3]. Sylvia Rubin's husband, who predeceased her, was Charles Rubin. [<u>Id.</u> ¶ 44]. Defendant Shabshelowitz served as the Rubins' estate planning lawyer and accountant from as early as 1988. [<u>Id.</u> ¶ 48]. Shabshelowitz was a co-executor of Charles Rubin's estate, along with Sylvia Rubin and one of the Rubins' daughters, Betsy Corman. [<u>Id.</u> ¶ 49]. After Charles Rubin's death in 2010, Sylvia Rubin appointed Corman as her attorney-in-fact. [<u>Id.</u> ¶ 50]. After Corman's death in April 2015, Plaintiff was appointed Sylvia Rubin's attorney-in-fact. [<u>Id.</u> ¶ 51]. The Trust was created upon Sylvia Rubin's death in 2018. [<u>Id.</u> ¶ 54].

At all relevant times, Sylvia Rubin owned one of eleven limited partnership units in an affordable housing development called Mercantile Wharf, located at 111 Atlantic Avenue in Boston. [Compl. ¶¶ 15–16]. Shabshelowitz was also a trustee for several trusts that owned partial units (the "Sousa Trusts"). [<u>Id.</u> ¶ 73]. In February 2015, the General Partner of Mercantile Wharf initiated a merger that would result in a cash payment to unit owners of $772,000 per unit. [<u>Id.</u> ¶¶ 68–69]. Shabshelowitz advised Corman, on behalf of Sylvia Rubin, to accept the merger terms, although he advised her to delete language in the merger agreement that would release the General Partner from liability for the transaction. [<u>Id.</u> ¶ 78]. Shabshelowitz

deleted the same language on behalf of the Sousa Trusts. [Id. ¶ 79]. Sylvia Rubin was ultimately paid the $772,000. [Id. ¶ 77].

Another entity, MW Associates LLC ("MW Associates")—an affiliate of Defendant Weston Associates—owned 1.5 units in the Mercantile Wharf limited partnership. [Compl. ¶ 80]. MW Associates did not accept the cash payout and instead, represented by Defendant Upton, sued the General Partner. [Id. ¶¶ 82–83 (citing MW Associates LLC v. Mercantile Affordable Partners LLC, Suffolk County Superior Court, Civil Action No. 1684CV00486 ("Mercantile I"))]. On August 14, 2017, Weston Associates contacted Shabshelowitz to suggest that his clients (including Sylvia Rubin) assign their interests in potential claims against the General Partner in exchange for 50% of the net proceeds of the claims. [Id. ¶ 89]. Shabshelowitz forwarded the proposed assignment to Plaintiff. [Id. ¶ 91].

Plaintiff, on behalf of the Sylvia Rubin Trust, contacted Weston Associates regarding the assignment. [Compl. ¶ 94]. When Plaintiff spoke to Weston Associates, Weston Associates did not disclose that they had completed an appraisal that assessed the fair market value of the unit at $1,821,000, a much higher sum than the $772,000 paid out. [Id.] Shabshelowitz advised Plaintiff to accept Weston Associates' claim assignment proposal, [id. ¶ 99], and Plaintiff did so on August 18, 2017, [id. ¶ 104]. On September 25, 2017, the court in Mercantile I entered a judgment for conversion for $2,731,500 plus interest. [Id. ¶ 87].

On November 13, 2017, Weston Associates proposed a new agreement to Plaintiff that would supersede the previous, turning the claim assignment into an attorney-in-fact agreement (the "AIF Agreement"). [Compl. ¶ 109]. Shabshelowitz advised Plaintiff to accept the new agreement. [Id. ¶ 112].

3

On January 26, 2018, the General Partner reached out to Sylvia Rubin through Shabshelowitz with a letter (the "Belveron Letter") proposing to discuss settlement based either upon payment or return of the unit. [Compl. ¶ 22]. Shabshelowitz forwarded the Belveron Letter to Weston Associates, but not to Plaintiff. [Id. ¶ 24]. The Belveron Letter stated:

> After nearly three years, the General Partners elected to end protracted litigation with an outside group by offering either (A) a cash settlement or (B) entry into the partnership commensurate with economic interest they held at the time of the merger. The GPs ended the litigation using the Plaintiff's opinion of value, $48M, at the time of the merger (February 2015). For context, MassHousing's current appraisal is $40.8M (July 2017), but as you can likely appreciate, we have little appetite for litigation.
>
> We maintain the 2015 outcome was eminently fair given the risks at the time and the fact LPs received the same value as Mercantile's GP. We are, however, in a position to offer options of additional recompense to end even the hint of litigation. The most elegant solutions we can envision are either more money or restoring your position in the partnership, both of which we are amenable to, and we would like to discuss with you directly.

[ECF No. 1-2].

Litigation on behalf of those who had assigned claims to Weston Associates, including Sylvia Rubin and the Sousa Trusts, was filed on March 21, 2018 ("Mercantile II"). [Compl. ¶ 120]. Defendant Upton was the attorney of record for all plaintiffs. [Id.] The General Partner responded with an Answer and Counterclaim on September 17, 2018. [Id. ¶ 122]. This Counterclaim alleged that Shabshelowitz was partially responsible for the damages suffered by Plaintiff, which Weston Associates and Upton did not disclose to Plaintiff. [Id. ¶ 123].

After Sylvia Rubin's death in 2018, Upton prepared a Fair Market Value Appraisal Report For Estate Tax Filing Purposes (the "Appraisal Report") of Sylvia Rubin's claim dated May 10, 2019, placing the value of the claim at $110,000. [ECF No. 1-3 at 2–4].

The case settled on July 30, 2021. [Compl. ¶ 141]. The Trust received $948,620.51 as a result of the settlement, [id. ¶ 148], and Weston Associates received $1,422,930, as a cumulative amount based on all the attorney-in-fact agreements with various plaintiffs, [id. ¶ 149].

In August 2022, Plaintiff requested several documents from the Mercantile II litigation from Upton for use in unrelated litigation. [Compl. ¶ 150]. Plaintiff at that time received the transcript of Shabshelowitz's deposition, of which Plaintiff was previously unaware. [Id. ¶¶ 151–52]. Through the transcript, Plaintiff learned for the first time of the Belveron Letter. [Id. ¶ 43]. Although Plaintiff has still not seen a copy of the Belveron Letter addressed to Sylvia Rubin, a letter sent to a similarly situated limited partner was sent to Plaintiff by Upton on August 17, 2024. [Id. ¶ 26].

### B. Procedural History

Plaintiff filed a complaint against Shabshelowitz, Weston Associates, and Upton on August 23, 2024. See generally [Compl.]. All Defendants moved to dismiss on November 18, 2024. [ECF Nos. 16, 18, 20]. Plaintiff opposed on January 17, 2025. [ECF Nos. 24–26]. Weston Associates filed a reply on January 31, 2025. [ECF No. 29]. Upton filed a reply on February 5, 2025. [ECF No. 32]. Shabshelowitz filed a reply on February 13, 2025. [ECF No. 33].

## II. DISCUSSION

### A. Legal Standard

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze them in the light most favorable to the plaintiff, and draw all reasonable inferences from those facts in favor of the plaintiff. United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011).

Additionally, "a court may not look beyond the facts alleged in the complaint, documents incorporated by reference therein and facts susceptible to judicial notice." MIT Fed. Credit Union v. Cordisco, 470 F. Supp. 3d 81, 84 (D. Mass. 2020) (citing Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)). "[A] complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief,'" Cardigan Mt. Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)), and set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Pitta v. Medeiros, 90 F.4th 11, 17 (1st Cir. 2024) (quoting Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)). Although detailed factual allegations are not required, a complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Iqbal, 556 U.S. at 678). "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. at 44 (quoting Iqbal, 556 U.S. at 679). "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)). "The plausibility standard invites a two-step pavane." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (citing Grajales,

682 F.3d at 45). First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." <u>Id.</u> (quoting <u>Morales-Cruz v. Univ. of P.R.</u>, 676 F.3d 220, 224 (1st Cir. 2012)). Second, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" <u>Id.</u> (quoting <u>Morales-Cruz</u>, 676 F.3d at 224).

When reviewing a motion to dismiss, the Court may consider documents outside of the pleadings, "'the authenticity of which are not disputed by the parties,' making narrow exceptions to the general rule 'for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'" <u>Álvarez-Maurás v. Banco Popular of P.R.</u>, 919 F.3d 617, 622–23 (1st Cir. 2019) (quoting <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993)).

For claims sounding in fraud, and, as relevant here, claims alleging fraudulent misrepresentation, Federal Rule of Civil Procedure 9(b)'s special pleading requirements apply. Rule 9(b) states that "a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The First Circuit interprets this standard as requiring parties to set out "the who, what, where, and when of the allegedly false or fraudulent representation," <u>Alt. Sys. Concepts, Inc. v. Synopsys, Inc.</u>, 374 F.3d 23, 29 (1st Cir. 2004), and specify "the basis for inferring scienter," <u>Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.</u>, 419 F. Supp. 3d 176, 189 (D. Mass. 2019) (quoting <u>N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale</u>, 567 F.3d 8, 13 (1st Cir. 2009)).  In misstatement cases, "the specificity requirement extends only to the particulars of the allegedly misleading statement itself.  The other elements of fraud, such as intent and knowledge, may be averred in general terms." <u>Rodi v. S. New Eng. Sch. of L.</u>, 389 F.3d 5, 15 (1st Cir. 2004) (citations omitted); <u>see also</u> <u>Runyon v. Wellington Mgmt. Co., LLP</u>,

No. 13-cv-11236, 2015 WL 1276825, at *5 (D. Mass. Mar. 20, 2015) (noting that "reliance" is not subject to Rule 9(b)'s heightened pleading requirement).

### B.    Analysis

#### 1.    Statute of Limitations

Under Massachusetts law, the statute of limitations for torts, including breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, legal malpractice, and fraud (Claims I–III, V–VI, IX–XIII), is three years.  Fincher v. Town of Brookline, 26 F.4th 479, 485–86 (1st Cir. 2022) (citing Mass. Gen. Laws ch. 260, § 2A).  In general, "a tort cause of action accrues either when the plaintiff is injured as a result of the defendant's unlawful act or omission, or, if the wrong is 'inherently unknowable,' when the plaintiff knows or should have known that [s/he] has been injured." Pagliuca v. City of Boston, 626 N.E.2d 625, 628 (Mass. App. Ct. 1994) (citations omitted).

Breach of contract claims have a six-year statute of limitations.  Berezin v. Regency Sav. Bank, 234 F.3d 68, 73 (1st Cir. 2000) (citing Mass. Gen. Laws ch. 260, § 2).  "[T]he cause of action accrues at the time of breach."  Cranberry Commons, Ltd. v. Orograin Bakeries, Inc., No. 11-cv-11654, 2013 WL 5441571, at *1 n.1 (D. Mass. Sept. 30, 2013).

Massachusetts Chapter 93A claims have a four-year statute of limitations.  M.G.L. ch. 260, § 5A.  "The accrual dates of the c. 93A claims are established by the same principles as govern the determination of the underlying actions."  Hanson Hous. Auth. v. Dryvit Sys., Inc., 560 N.E.2d 1290, 1295 (Mass. App. Ct. 1990).

The parties do not dispute that the relevant conduct occurred between 2015 and 2018. Therefore, if the statutes of limitations applied to these claims, all would be barred, with the

8

exception of the breach of contract claims, for which any breaching conduct after August 23, 2018 could form the basis of a claim.

With regard to all of the claims, Plaintiff argues that the statute of limitations is tolled by the fraudulent concealment doctrine.  The statutory fraudulent concealment doctrine "tolls the statute of limitations 'where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part.'"  Krick v. Raytheon Co., 695 F. Supp. 3d 202, 216 (D. Mass. 2023) (quoting Salois v. Dime Sav. Bank, FSB, 128 F.3d 20, 25 (1st Cir. 1997)) (citing Mass. Gen. Laws ch. 260, § 1).  Importantly, "[a]lthough active fraud ordinarily is required to constitute fraudulent concealment for the purposes of Section 12's tolling provision, Massachusetts courts have recognized that mere failure to reveal information can be fraudulent concealment by a person, such as a fiduciary, who has a duty to disclose."  Geo. Knight & Co. v. Watson Wyatt & Co., 170 F.3d 210, 215 (1st Cir. 1999) (citations omitted).[1]  Because all of Plaintiff's fraudulent concealment arguments are premised on an omission theory, the applicable elements are: (1) a fiduciary duty, (2) a failure to disclose in violation of that duty, (3) an injury, and (4) caused by the failure to disclose.

Additionally, Plaintiff argues that the attorney malpractice claims and breach of fiduciary duty claims are tolled by the discovery rule.  See, e.g., [ECF No. 24 at 14].  The discovery rule extends a statute of limitations period for claims for legal malpractice and breach of fiduciary duty "by tolling the statute of limitations to the point in time when the alleged harm or loss caused by the legal malpractice is (or reasonably should have been) discovered. 'The statute of

---

[1] Both of these doctrines require an element of deception and therefore are governed by the heightened Rule 9(b) pleading standard.  Cf. Khelfaoui v. Lowell Sch. Comm., 496 F. Supp. 3d 683, 689 (D. Mass. 2020) ("A claim for misrepresentation must be pled with particularity.").

limitations does not begin to run on a claim of malpractice until the plaintiff knows or reasonably should know that he or she has been harmed by the defendant's conduct.'" Frankston v. Denniston, 907 N.E.2d 244, 250 (Mass. App. Ct. 2009) (quoting Williams v. Ely 668 N.E.2d 799, 804 (Mass. 1996)).

i.    Claims against Shabshelowitz

With regard to the tort claims against Shabshelowitz (Counts I–III), Plaintiff's argument[2] is premised on Shabshelowitz's failure to share the Belveron Letter, which occurred in early 2018 but was not discovered by Plaintiff until 2022. [Compl. ¶¶ 22, 43]. Shabshelowitz first argues that he was not a fiduciary of the Trust. [ECF No. 17 at 16–20]. He further argues that the claim would have accrued in 2017, when Mercantile I settled, [id. at 12]; and that the Belveron Proposal is insufficient to save the claim because it was circulated after Plaintiff had signed away all rights to the claim against the General Partner through the AIF Agreement, [id. at 11–12].

The essential elements for tolling via fraudulent concealment against Shabshelowitz are (1) whether Shabshelowitz owed a fiduciary duty to the Trust as its attorney; (2) whether the Belveron Proposal is the type of update that an attorney is obligated to disclose, such that Shabshelowitz breached any such fiduciary duty by failing to disclose it; and relatedly, whether

---

[2] Plaintiff also argues for equitable tolling. When a plaintiff becomes on notice that an injury might have been caused by a third party, the statute of limitations may remain tolled under a principle of equitable tolling if he is diligent in pursuing his rights and some extraordinary circumstance prevents filing the action. Menominee Tribe of Wis. v. United States, 577 U.S. 250, 255 (2016). Equitable tolling is only applied in rare cases, see Doe v. Sanderson, No. 16-cv-12068, 2018 WL 1586026, at *4 (D. Mass. Mar. 30, 2018) (holding equitable tolling is "exceptional" and applying it in a case where plaintiffs would be in a "catch-22"), and the Court is not convinced that this is such a case. To the extent that it is, it largely overlaps with Plaintiff's other theories of tolling.

10

the AIF Agreement assigning the claims to Weston relieved Shabshelowitz of the duty to disclose the existence of the Belveron proposal to Plaintiff; and (3) whether Plaintiff was injured by the failure to disclose the Belveron proposal.  The elements for the discovery rule theory here are similar, except that Plaintiff need not have been injured by the failure to disclose the Belveron Letter itself; it is just necessary that the failure to disclose the Belveron Letter left Plaintiff ignorant that he had been injured by attorney malpractice.  See Frankston, 907 N.E.2d at 250.

     As to the first question, Shabshelowitz argues that he was acting in his role as an accountant and had, in fact, not been an attorney for the family for many years, as evidenced by the lack of any formal retainer agreement with Sylvia Rubin.  [ECF No. 17 at 18–19].  Plaintiff responds that, given that Shabshelowitz is an attorney, his history with the family, and his responses to legal questions, both Sylvia Rubin and Plaintiff reasonably believed that Shabshelowitz was acting in his capacity as an attorney such that the relationship was implied. [ECF No. 24 at 2–3, 17].

     An attorney agreement "may be implied 'when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.'"  Miller v. Mooney, 725 N.E.2d 545, 549 (Mass. 2000) (quoting DeVaux v. American Home Assur. Co., 444 N.E.2d 355, 357 (Mass. 1983) (further internal quotations omitted).  The third element can be satisfied by an allegation "of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them, and the attorney, aware of such reliance, does nothing to negate it."  Int'l Strategies Grp., Ltd. v. Greenberg Traurig, LLP, 482 F.3d 1, 7 (1st Cir. 2007) (quoting DeVaux, 444 N.E.2d at

358)).  The "attorney-client relationship generally is a matter for the trier of fact to determine." Matter of Stern, 682 N.E.2d 867, 871 n.7 (Mass. 1997).

The Complaint adequately alleges that Plaintiff and Plaintiff's predecessors in interest sought legal advice from Shabshelowitz and that he provided it.  For example, he recommended that Plaintiff remove the release provision from the General Partner's opening merger offer. [Compl. ¶ 78].  Construing all allegations in Plaintiff's favor, a suggestion to delete a contractual provision is not clearly merely accounting work.  Shabshelowitz's dual role as an accountant does not absolve him; indeed, Plaintiff has alleged that his "role as . . . financial advisor [is] inextricably linked to his role as [an] attorney and thus any action taken by the [defendant] with respect to the trust should have included considerations with respect to his role as [an] attorney." Matter of Stern, 682 N.E.2d at 871.  It is incumbent upon lawyers as part and parcel of the privilege of practicing that, should they choose to engage in client services work outside of the practice of law, they make clear to their clients what their role is.  Thus, the Court is unpersuaded by his argument that he acted only as an accountant with respect to Plaintiff and Plaintiff's predecessors.

As to the second question, the Court is persuaded that Plaintiff has adequately alleged a breach of Shabshelowitz's duty to disclose.  "The attorney owes his client a duty of full and fair disclosure of facts material to the client's interests."  Hendrickson v. Sears, 310 N.E.2d 131, 135 (Mass. 1974).  The willingness of an adverse party to discuss settlement is material to Plaintiff's interests.

Shabshelowitz additionally argues that he had no duty to disclose because he knew of the assignment of rights to Weston Associates, which occurred prior to the circulation of the Belveron Letter, and therefore he did not believe Plaintiff had any interest in the Letter's

contents. Shabshelowitz's arguments miss the mark. What steps Plaintiff may have taken vis-à-vis Weston Associates to preserve his interests after learning of the opportunity for settlement seems to be a factual question unsuitable for a motion to dismiss. And regardless, as a fiduciary, Shabshelowitz was obligated to disclose the Letter.

The final element is a closer call, but construing all facts in Plaintiff's favor, Plaintiff has alleged an injury stemming from Shabshelowitz's failure to disclose the Belveron Letter. Plaintiff was uninformed about the full circumstances of the Mercantile litigation and unable to preserve his rights, including by potentially mitigating attorneys' fees and costs. See [Compl. ¶ 168]. Further, knowing about the Belveron Letter would have exposed Weston's breach of fiduciary duty earlier. This is sufficient to satisfy the fraudulent concealment standard.

Moreover, Plaintiff has likewise adequately pled that the Belveron Letter is of sufficient import to toll the statute of limitations under the discovery rule with respect to attorney misconduct. "The attorney, like the doctor, is an expert, and much of his work is done out of the client's view. The client is not an expert; he cannot be expected to recognize professional negligence if he sees it, and he should not be expected to watch over the professional or to retain a second professional to do so." Hendrickson, 310 N.E.2d at 135. Given the apparent mismatch in the parties' understandings of Shabshelowitz's role, Plaintiff would not have known that Shabshelowitz failed to do any diligence in advising Plaintiff to accept the AIF Agreement (because Shabshelowitz did not believe that he needed to in his purported role as an accountant, [ECF No. 17 at 18–19]) and that there were in fact opportunities for settlement available other than the AIF Agreement. The Belveron Letter would have revealed to Plaintiff the General Partner's willingness to settle the claims, which could have served as the basis for a malpractice

claim against Shabshelowitz much earlier.  Plaintiff did not learn of the Belveron Letter until 2022 or see the letter until 2024, within the statute of limitations.

Therefore, Plaintiff's tort claims against Shabshelowitz, with the exception of those premised on Shabshelowitz's original alleged negligence in advising Plaintiff and Plaintiff's predecessors in interest to accept the $772,000 from the General Partner, may proceed to the merits.

ii.    Claims Against Weston Associates

Plaintiff's arguments that his claims against Weston are not time barred are similarly premised on the Belveron Letter.  [ECF No. 25 at 14].  Plaintiff argues that his second agreement with Weston Associates, which turned the assignment of claims into the Attorney-in-Fact Agreement, rendered Weston Associates a fiduciary, and therefore it had heightened responsibilities beyond what would have been required under the claim assignment agreement. [Id. at 11].  Therefore, Weston's failure to disclose the Belveron Letter could serve as a basis for tolling via fraudulent concealment.  [Id. at 14].  Weston Associates argues that because its responsibilities were limited by the terms of the agreement, rather than established by fiduciary principles, it had no duty to disclose and there is thus no basis for fraudulent tolling.  [ECF No. 19 at 2, 4].

As set forth supra, the first question is whether Weston Associates owed a fiduciary duty to disclose the information.  The Court agrees with Plaintiff that it did.  Plaintiff compellingly argues that the language change from the claim assignment agreement to the AIF Agreement created a fiduciary duty with respect to the litigation.  [ECF No. 25 at 12 n.4].  "In Massachusetts, it appears settled that a power of attorney creates a fiduciary relationship between a principal and her attorney-in-fact."  In re Georges, No. 19-cv-11761, 2021 WL 2566742, at *6

(Bankr. D. Mass. June 22, 2021) (citing Perez v. First Option Mortg. Corp. (In re Perez), No. 08-cv-40693, 2008 WL 4164372, at *5 (Bankr. D. Mass. Sept. 3, 2008); Gagnon v. Coombs, 654 N.E.2d 54, 60 (Mass. 1995)).

As to the remaining factors, Weston argues that, even if it was a fiduciary, it had no duty to disclose the Belveron Letter.  [ECF No. 19 at 15].  Weston argues that "whether or not Plaintiff was made aware of the Belveron [Letter], he had no right or ability to do anything about it because he had already contracted away all settlement authority to Weston."  [Id.].  "Courts have imposed on a fiduciary an affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts.'"  Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc., 375 U.S. 180, 194 (1963).  Although it is true that Plaintiff, on the facts alleged, had made such an agreement, the agreement did not relieve Weston Associates of—to the contrary, it established—the duty to act in Plaintiff's best interest as a fiduciary.  Learning of the Belveron Letter earlier would have provided Plaintiff with sufficient information to evaluate whether Weston Associates was acting in Plaintiff's best interests, and therefore the Trust was injured by being left unaware of it.

Because, as stated above, 93A tolling is coextensive with the underlying claims, it is also tolled.

The breach of contract claim against Weston Associates is not time barred for a different reason.  The breach of contract claim is premised on Weston's failure to "keep Mrs. Rubin advised of the progress of the litigation."  [Compl. ¶ 215].  This includes the allegation that Weston did so "by withholding the counterclaim against Shabshelowitz or any meaningful information about it from [Plaintiff], and by issuing the Appraisal Report which grossly misrepresented the status and potential value of the litigation."  [Id. ¶ 217].  Regardless of the

merits of this claim, this action is timely for both of those asserted breaches (which occurred in September of 2018 and May of 2019, respectively), and therefore this claim is not barred. To the extent that the breach of contract claim is premised on the failure to provide Plaintiff information about the Belveron Letter contemporaneously, see [id.], the Court finds that the statute of limitations for this would also be tolled for the same reason as the tort claims.

### iii.    Claims Against Upton

Plaintiff argues that the fraudulent concealment doctrine and discovery rule apply as to the claims against Upton for two reasons: first, because Upton was Plaintiff's lawyer and breached his fiduciary duty by concealing the Belveron Letter, [ECF No. 26 at 13–14], and second, because Upton affirmatively deceived Plaintiff through the Appraisal Report, [id. at 15].

As to the first argument, Upton argues he was not Plaintiff's attorney, and therefore there is no fiduciary duty or breach thereof alleged. [ECF No. 21 at 16–18]. This argument borders on frivolous; among other things, Upton plainly represented himself as Plaintiff's attorney in Massachusetts state court in Mercantile II. Indeed, the Appraiser's Report, prepared and signed by Upton, states: "Mr. Upton represents the plaintiffs, including the estate of Sylvia Rubin, in the action that is the subject of this appraisal." [ECF No. 1-3 at 3]. Nevertheless, Plaintiff had given Weston Associates limited power-of-attorney with regard to the litigation. [ECF No. 1-1]. To the extent Weston Associates breached its fiduciary duty to Plaintiff as its agent, the Court is skeptical that that breach can be imputed to Upton. See Margolis v. Benton, 72 N.W.2d 213, 215 (Mich. 1955) ("A third person . . . who deals with an agent, is not liable to the principal for a fraud perpetrated by the agent upon his principal in that transaction unless such third person was a party to the fraud." (citations omitted)); Mason v. Bauman, 62 Ill. 76 (1871). To make Upton

16

liable for not separately providing to Plaintiff every piece of information that was available to Plaintiff's agent would defeat the purpose of an attorney-in-fact agreement.[3]

As to the second grounds for fraudulent concealment, Plaintiff has not adequately alleged that the Appraisal Report was deceptive. The Appraisal Report specifically lays out that (1) Weston Associates brought Mercantile I; and (2) Weston Associates settled for a value of $1,821,000 per unit. [ECF No. 1-3 at 4]. The Appraisal Report states that the maximum recovery at the time was likely to be $751,200, which is relatively close to what was ultimately received.[4] [Id. at 5]. The discounts on that to $110,000 were based on subjective assumptions of risk that someone purchasing the claim would perceive based on Upton's professional experience. [Id.] This is insufficient to support a claim of fraud.[5]

Because, as stated above, 93A tolling is coextensive with the underlying claims this claim is also time barred.

Despite the Court's reluctance to do so given his obvious bad faith in briefing, it finds that the claims against Upton are time-barred, and the motion to dismiss is **GRANTED** with respect to Counts VII–XIII.

---

[3] For similar reasons, since the Court does not believe Upton had an independent duty to disclose the Belveron Letter to Plaintiff, the Discovery Rule is likewise inapplicable.

[4] The Settlement Agreement (which the Court agrees is integral to the claims at issue here and therefore it may consider it on motion to dismiss, Arco Ingenieros, S.A. de C.V. v. CDM Int'l Inc., 368 F. Supp. 3d 256, 260 (D. Mass. 2019)) states that the total amount paid to Weston was $3 million. [ECF No. 19-6]. At 1.83 units, this equates to $1,639,344.26 per unit. The attorneys' fees and costs were $154,140; the pro rata share of that deducted from Plaintiff's portion of the recovery equates to $1,555,114.75. [Id.] Divided 50% with Weston, this equates to $777,557.38. This is very close to the $751,200 number cited in the appraisal report.

[5] To the extent that this analysis would be changed in any way by allegations that Upton was "aiding and abetting" Weston's breaches, see [Compl. ¶ 263], there are no nonconclusory, nonspeculative facts in the Complaint that would support such a finding.

### 2. Breach of Fiduciary Duty

As stated <u>supra</u>, Plaintiff brings a breach of fiduciary duty claim against both Shabshelowitz and Weston. "To prevail on [a] claim for breach of fiduciary duty [under Massachusetts law] . . . , the plaintiff[] must show: (1) the existence of a fiduciary duty; (2) breach of that duty; (3) damages; and (4) a causal connection between breach of the duty and the damages." <u>Baker v. Wilmer Cutler Pickering Hale & Dorr LLP</u>, 81 N.E.3d 782, 789 (Mass. App. Ct. 2017). "[T]he relationship between attorney and client, like those between trustee and beneficiary, director and corporation, guardian and ward, is fiduciary as matter of law." <u>Id.</u> (quoting <u>Markell v. Sidney B. Pfeifer Foundation, Inc.</u>, 402 N.E.2d 76, 94 (Mass. App. Ct. 1980)).

#### i. <u>Shabshelowitz</u>

Plaintiff argues that Shabshelowitz breached his fiduciary duties by (1) advising Mrs. Rubin's attorney-in-fact to accept the original agreement and payment; (2) advising Plaintiff to enter into the AIF Agreement with Weston without investigating the fair market value of the value of Mercantile Wharf or the potential to negotiate with the General Partner; and (3) failing to forward the Belveron Letter to Plaintiff. [Compl. ¶¶ 160–72]. Shabshelowitz argues that (1) he did not have a fiduciary duty to Plaintiff, (2) the claims are barred by the statute of limitations; and (3) there is no causal nexus between his conduct and the harm suffered by plaintiff. <u>See generally</u> [ECF No. 17]. Having already addressed his first and second argument <u>supra</u>, the Court turns to Shabshelowitz's only remaining argument on the substance of the claims.

Shabshelowitz's argument on the third assertion of breach, that is the failure to forward the Belveron Letter, is that, because the Belveron Letter postdated both the assignment

agreement and the AIF Agreement, his failure to provide the letter to Plaintiff could not have caused any injuries stemming from the choice to assign the claims rather than settle them directly, and any allegation to the contrary is speculation.  [ECF No. 17 at 13].  "But [that] argument goes only to the problem of proof which may face [P]laintiff," and though "[i]t may be difficult to show" that Plaintiff could have resolved the claims more favorably through more-informed interactions with Weston Associates, "[P]laintiff has undertaken to prove that allegation and should be given his opportunity to do so."  La Chapelle v. United Shoe Mach. Corp., 90 F. Supp. 721, 723 (D. Mass. 1950).

As to the first two instances of breach cited by Plaintiff, that is advising Mrs. Rubin's attorney-in-fact to accept the original agreement and advising Plaintiff to enter into the AIF Agreement, however, "[a]n attorney's negligence, without more, does not implicate a breach of fiduciary obligations and so does not support a cause of action for fiduciary breach."  Cain v. Kramer, No. 00-cv-10341, 2002 WL 229694, at *6 (D. Mass. Feb. 4, 2002).  Therefore, the motion to dismiss Count I is **GRANTED** with respect to Shabshelowitz's diligence in advising his client and **DENIED** with respect to the Belveron Letter.

ii.    <u>Weston Associates</u>

Plaintiff alleges that Weston breached its fiduciary duties,

> by failing to provide Cooper with a copy of the Belveron [Letter], failing to engage in reasonable pre-suit attempts to settle the claim and potentially obtain reinstatement of [his] interest in the Limited Partnership, failing to inform Cooper of the anticipated value of the claim, failing to inform Cooper of Shabshelowitz's role as a potential party to the suit, drawing out the litigation by waiting for months to filed [sic] the amended complaint and serving the suit, failing to disclose that the General Partner filed a counterclaim asserting that Shabshelowitz had committed malpractice toward Mrs. Rubin, abandoning the <u>Mercantile I</u> valuation and incurring the expense of a second appraisal, failing to provide Cooper meaningful progress updates on the litigation, and other actions that delayed <u>Mercantile II</u> with no benefit to the Trust.

19

[Compl. ¶ 210].  The Court addresses each of these allegations.

Weston correctly notes that it had no fiduciary duty prior to the execution of the AIF Agreement, including to disclose the anticipated value of the claim.  [ECF No. 19 at 16].  Thus, the Court grants the motion to the extent that the claim is premised on any actions or omissions prior to the signing of the AIF Agreement.

Regarding whether Weston had a responsibility to try to settle earlier in light of the Belveron Letter, Weston argues that the AIF Agreement gave it full authority to settle and therefore the contract should govern, rather than traditional fiduciary duty principles.  [ECF No. 19 at 17].  Plaintiff responds that the authority to prosecute the claims in Weston's discretion implicitly included a responsibility to do so in good faith.  [ECF No. 25 at 12].  Although Plaintiff relies extensively on cases involving insurers pursuing litigation on behalf of their insured, which is not the posture before the Court, the Court nonetheless finds this persuasive in light of the reasoning in those cases.  See Murach v. Mass. Bonding & Ins. Co., 158 N.E.2d 338, 340–41 (Mass. 1959) ("Although [the policy] language leaves the matter of settlement entirely to the insurer's discretion, its privilege in this respect imports a reciprocal obligation for its exercise.  That obligation is to act in good faith."  (citations omitted)).  As the Murach court noted, even where an agreement similar to this one gives exclusive settlement authority to a party that may have diverging interests from the assignor, it is still necessary to "mitigate the danger" that the party with settlement authority "will favor its own interest to the exclusion" of the assigning party.  Id.  Plaintiff has sufficiently alleged that Weston Associates did not engage in settlement negotiations in good faith following the receipt of the Belveron Letter.  This is especially the case in light of the Belveron Letter's offer to discuss the return of the unit, which may have substantially reduced Weston's windfall.

With regard to the Belveron Letter itself, the Court need not rehash its reasoning at length.  For the same reasons as its holding on tolling, the Court finds that Plaintiff has sufficiently alleged a violation of fiduciary duty based on Weston's failure to disclose the existence of the Belveron Letter.

Therefore, Weston's motion to dismiss Count VI is **<u>GRANTED</u>** in part and **<u>DENIED</u>** in part.

### 3.    Legal Malpractice

Plaintiff alleges legal malpractice against Shabshelowitz.  [Compl. ¶¶ 173–77].  The elements of a legal malpractice claim under Massachusetts law are (1) an attorney-client relationship, (2) breach of the relevant standard of care, (3) causation, and (4) damages.  <u>Albert v. Zabin</u>, No. 09-P-00889, 2009 WL 2013821, at *3 (Mass. App. Ct. July 14, 2009) (unpublished table decision).[6]

The Complaint alleges several breaches by Shabshelowitz, namely that Shabshelowitz never "made enquiries or analyses as to the value of Mrs. Rubin's . . . interest in the Limited Partnership or the potential to recover damages from the General Partner," [Compl. ¶ 175], and by "advising Mrs. Rubin to sacrifice 50% of her claim against the General Partner as the only option to pursue as 'found money,'" [<u>id.</u> ¶ 176].  Shabshelowitz argues that the only alleged act of malpractice was the failure to contemporaneously give Plaintiff the Belveron Letter, which did not cause the alleged harm of overpaying legal costs and contingency to Weston Associates

---

[6] Outside of the attorney-client relationship prong, which the Court addresses <u>supra</u>, Shabshelowitz largely argues only that there is no "causal nexus" to support a legal malpractice claim.  [ECF No. 17 at 12].  Although his causation argument is premised on the mistaken assumption that the only alleged breach was the failure to contemporaneously disclose the Belveron Letter, the Court will nevertheless analyze the breach element with respect to other allegations in the Complaint.

because the AIF Agreement had already been executed.  [ECF No. 17 at 14–15].  This, however, mischaracterizes the Complaint, which alleges that Shabshelowitz's advice to accept (1) the original merger offer and (2) Weston's assignment agreement constituted malpractice.  [Compl. ¶¶ 175–76].[7]  Although the first is barred by the statute of limitations, supra, Shabshelowitz offers no argument for how the Complaint fails to allege causation of harm with respect to the second.  Thus, the motion to dismiss Count II is **DENIED**.

### 4.        Negligence

Plaintiff brings a claim against Shabshelowitz for negligence.  "[T]he 'sole recourse for [an] attorney's negligence is an action for malpractice.'"  Bohrer v. Atkins, No. 13-P-01973, 2014 WL 7178189, at *2 (Mass. App. Ct. Dec. 17, 2024) (unpublished table decision) (quoting Commonwealth v. Patton, 934 N.E.2d 236, 243 (Mass. 2010)).  Thus, motion to dismiss Count III is **GRANTED**.[8]

---

[7] Indeed, in detailing how Shabshelowitz was not acting as an attorney, his own brief states the actions that he should have taken.  [ECF No. 17 at 19 ("Such a person's duty would indeed begin and end with forwarding the email with the proposed assignment, noting that Weston appeared "anxious" to sign them up and suggesting Cooper call them to find out more.  Such a person would not be reasonably expected to carry out analyses of whether directly approaching the General Partner and seeking a separate payment outside litigation would be a promising alternative strategy.  Nor should such a person be expected to carry out independent investigations of the status of pending litigation relating to the property or the existence and value of any expert appraisal reports.  Nor should such a person be expected to perform a separate legal risk-analysis to determine the fair market value for the fee structure for the proposed assignment with Weston."  (citations omitted))].

[8] To the extent that the negligence claim is argued in the alternative against Shabshelowitz depending on whether Shabshelowitz was acting as Plaintiff's lawyer, this claim fails because there was no duty, as all of the allegedly harmful conduct stemmed from his duty as an attorney to conduct reasonable diligence and disclose material information to his client.  See [ECF No. 17 at 16].

### 5.    Fraud

Plaintiff brings a claim against Weston for fraud.  "[I]n order to establish a claim for fraud, the plaintiff must show that [he] reasonably relied upon the defendant's representations as true, and that [he] sustained actual damages as a result of the defendant's misrepresentation."  Metro. Prop. & Cas. Ins. Co. v. Savin Hill Fam. Chiropractic, Inc., 266 F. Supp. 3d 502, 539 (D. Mass. 2017).

Plaintiff's claims are essentially that Weston misrepresented the status of Mercantile I and the value of Plaintiff's claims to fraudulently induce him to enter into the assignment agreement.  [Compl. ¶¶ 191–206].  Weston argues that it did not conceal any information and that all alleged omissions in connection with the fraud claim pre-dated any fiduciary duty Weston had to Plaintiff.  [ECF No. 19 at 12–13].

Defendant has the better of this argument.  "Under Massachusetts law, a fraud claim predicated upon an omission must allege a duty to disclose and 'there can be no actionable claim of fraud for failure to disclose in the absence of a duty to disclose.'"  AcBel Polytech, Inc. v. Fairchild Semiconductor Int'l, Inc., No. 13-cv-13046, 2014 WL 4656608, at *10 (D. Mass. Sept. 12, 2014) (quoting Royal Bus. Grp., Inc. v. Realist, Inc., 933 F.2d 1056, 1064 (1st Cir. 1991)).  Plaintiff does not allege any affirmative deceitful statements with regard to Weston's alleged inducement.  Moreover, the information about Mercantile I that Plaintiff alleges was omitted was publicly available, and therefore not fraudulently concealed.  See Squeri v. Mount Ida Coll., No. 18-cv-12438, 2019 WL 2249722, at *3 (D. Mass. May 24, 2019) (holding no fraud where "audited financial disclosres . . . were publicly available"), aff'd, 954 F.3d 56 (1st Cir. 2020).  Thus, Weston's motion to dismiss Count V is **<u>GRANTED</u>**.

### 6.        Massachusetts General Laws Chapter 93A

Plaintiff brings a claim against Weston Associates for a violation of Massachusetts General Laws Chapter 93A.  In Massachusetts, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are forbidden, Mass. Gen. Laws ch. 93A, § 2(a), and state law confers a private right of action on consumers injured by such conduct, see id. at § 9.  To state a claim under § 9, "a plaintiff must show that the defendant engaged in trade or business and committed an unfair or deceptive practice, causing economic injury to the plaintiff."  Hanrahran v. Specialized Loan Servicing, LLC, 54 F. Supp. 3d 149, 153 (D. Mass. 2014).

The Complaint alleges that,

> Weston Associates acted unfairly and deceptively when it aggressively pursued the Assignment and the AIF Agreement, misrepresented the difficulty that asserting a claim against the General Partner would entail, obfuscated the anticipated value of the potential claim, and failed to inform Cooper of critical matters prior to and during the litigation, including the Belveron [Letter], the Counterclaim, and the defense asserted by the General Partner based upon the existence of the Attorney-in-Fact Agreement.

[Compl. ¶ 186].

The first bucket of these allegations, at bottom, is a claim of fraudulent inducement to enter into the claim assignment agreement and the later AIF Agreement.  As Defendant argues, "if a Chapter 93A claim is 'derivative of' other claims which fail as a matter of law, the Chapter 93A claim 'must also fail.'"  Gattineri v. Wynn MA, LLC, 93 F.4th 505, 511 (1st Cir. 2024) (quoting Park Dive Towing, Inc. v. City of Revere, 809 N.E.2d 1045, 1050–51 (Mass. 2004)).  Because the Court agrees that the fraud claims are untenable, so too are any Chapter 93A claims brought on the same basis.

24

On the other hand, Weston's only argument for why the failure to keep Plaintiff apprised of the litigation was not unfair is because that merely amounted to breach of contract.  [ECF No. 19 at 15].  But this position does not adequately weigh Weston's position as Plaintiff's fiduciary and the imbalance of information available to the parties.  See Bakis v. Nat'l Bank of Greece, S.A., No. 921561, 1998 WL 34064622, at *14 (Mass. Super. Dec. 15, 1998) ("[T]he Bank's failure to disclose such information, in light of its position of trust and confidence, constitutes a betrayal of a fiduciary duty which may be deemed an unfair act under c. 93A, § 11.").

Moreover, Plaintiff has adequately, though thinly, alleged economic loss by alleging that Plaintiff "would have been in a better position to understand the issues and preserve his rights with respect to the litigation," including by potentially mitigating the attorneys' fees that were ultimately paid by the Trust.  [Compl. ¶ 168].  At this stage, this is sufficient for the Court, taking all inferences in Plaintiff's favor.

Thus, Weston's motion to dismiss Count IV is **GRANTED** in part and **DENIED** in part.

### 7.    Breach of Contract

Finally, Plaintiff brings a breach of contract claim against Weston Associates for failure to keep him apprised of the status of the litigation.  [Compl. ¶¶ 214–19].  This includes by failing to inform Plaintiff about the Belveron Letter and  about the General Partner's counterclaim against Shabshelowitz, and by issuing the Appraisal Report, which allegedly misrepresented the status and potential value of the litigation.  [Id. ¶ 217].  Weston Associates does not dispute the substance of the claim but argues that Plaintiff has not alleged any actual damages from the alleged failures, and therefore is entitled only to nominal damages.  [ECF No. 19 at 18–19].  It is unclear from the Complaint what damages are alleged from the failure to disclose the counterclaim against Shabshelowitz and the appraisal report.  The Belveron Letter, however, is a

different story.  Plaintiff's allegations that he could have taken action if he knew that the General

Partner wanted to settle, [Compl. ¶ 218], are sufficiently non-speculative to survive at this stage.

It would be illogical if the very consideration that Plaintiff had provided in the contract—the

right to settle the claim—could be weaponized against him to justify a breach.  Thus, the motion

to dismiss Count VII is **<u>DENIED</u>**.

### III.    CONCLUSION

Defendants' motion to dismiss is **<u>GRANTED</u>** as to Counts III, V, and VIII–XIII

**<u>DENIED</u>** as to Counts II and VII, and **<u>GRANTED IN PART AND DENIED IN PART</u>** as to

Counts I, IV, and VI.

**SO ORDERED.**

July 31, 2025                                                        */s/ Allison D. Burroughs*
                                                                    ALLISON D. BURROUGHS
                                                                    U.S. DISTRICT JUDGE